UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- X

RECURRENT CAPITAL BRIDGE
FUND I, LLC, CRAGMONT CAPITAL
LLC AND ETHAN EINWOHNER,

                Plaintiffs,

             - against -

ISR SYSTEMS AND SENSORS CORP.,
EMX GROUP, INC., EMX
INTERNATIONAL, INC., EMX
INTERNATIONAL LLC, JAMES M.
HERRMANN, ROBERT V. GIBBS AND
TIMOTHY ARION,

               Defendants.

------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/25/12

**OPINION AND ORDER**

**12 Civ. 772 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

      Three investors, Recurrent Capital Bridge Fund ("Recurrent"),

Cragmont Capital LLC ("Cragmont"), and individual investor Ethan Einwohner

bring several causes of action under contract, tort, and equity against defendants in

connection with the transfer of assets from an entity in which these investors held

shares to an entity in which they did not. Plaintiffs allege that James Herrmann,

Robert Gibbs, and Timothy Arion together formed EMX International LLC

("EMX-II") to circumvent plaintiffs' rights as shareholders in ISR Systems and

Sensors Corp. ("ISR") and its successors.  Plaintiffs claim that defendants fraudulently conveyed ISR's valuable assets – especially its corporate opportunity to purchase EMX Inc. – to a series of shell companies for no consideration, in breach of contract, and in breach of their fiduciary duties to plaintiffs as joint shareholders in ISR.  Arion and EMX-II each move to dismiss the claims against them pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction.[1]  Herrmann, Gibbs, Arion, ISR, EMX Group, EMX International Inc. ("EMX-I"), and EMX-II (collectively, "defendants") move to dismiss the claims against them under the doctrine of forum non conveniens or, alternatively, to transfer this action to the Middle District of Florida under section 1404(a) of Title 28 of the United States Code.  For the reasons set forth below, defendants' motions are denied in their entirety.

## II.   BACKGROUND[2]

In February of 2007, Herrmann founded ISR,[3] a Delaware corporation

---

[1]   Arion resides in Florida and has no contacts with New York other than those described herein.

[2]   The facts below include only those necessary for the resolution of the instant motions.  For the purposes of these motions, all of plaintiffs' un-rebutted factual averments are taken as true.

[3]   Arion disputes plaintiffs' allegation that he helped form and manage ISR, and held shares in it.  Plaintiffs support their allegations by pointing to a Private Placement Memo ("PPM") listing Arion as an officer and shareholder in the company.  Because the PPM only describes Herrmann as ISR's founder, Arion

with its principal place of business in Florida, for the purpose of acquiring three defense technology companies:  EMX Inc., Wave Technologies Inc. ("Wave"), and SensArray Infrared Corp. ("SensArray").[4]  In pursuit of those ends, ISR hired Highland Global Partners, Inc. ("Highland"), a New York corporation with its principal place of business in New York, to help raise the necessary financing for the acquisitions and to structure the planned transactions.[5]  Arion was personally involved[6] in Highland's work throughout this period.[7]  On behalf of ISR, a senior officer at Highland approached Recurrent, a Delaware Limited Liability Company with its principal place of business in New York, with an opportunity to invest in the new company.[8]  ISR decided to make a private offering of its common stock to

is considered to be an officer and shareholder in ISR, but is not considered to have been involved in its formation.

[4]      See PPM, Ex. 2 to Amended Complaint ("Am. Compl."), at 2, 4, 6.

[5]      See Am. Compl. ¶¶ 20-21.

[6]      Arion contends that he only did so in his capacity as CEO of EMX Inc.  See 3/19/12 Affidavit of Timothy J. Arion ("Arion Aff.") ¶¶ 7-10. For purposes of resolving these motions, I need not decide whether plaintiffs adequately rebutted his testimony.

[7]      See Am. Compl. ¶ 21; 4/28/10 Email from Arion to Ezra Schwartz (Einwohner's business parnter) ("4/28 Email"), Ex. 4 to Am. Compl. (affirming that Arion had been working with Highland since Spring 2007); 5/5/10 Email from Arion to Gibbs ("5/5 Email"), Ex. 5 to Am. Compl. (affirming that Arion had worked with Herrmann and Highland on the proposed transactions).

[8]      See Am. Compl. ¶¶ 5, 21.

certain investors ("Bridge Offering").[9]  In April 2008, Highland proposed that

Recurrent participate in the Bridge Offering and Recurrent agreed.[10]  Pursuant to

that agreement, Einwohner, in his position as a Recurrent officer, purchased

187,500 "Bridge Shares" of ISR's common stock in exchange for a $250,000

Bridge Loan pursuant to a duly executed Subscription Agreement.[11]  Herrmann

owned 25.1% of ISR's common stock prior to obtaining the bridge financing and

planned to retain 12.86% after dilution from the Bridge Offering, which was

expected to raise fifteen to eighteen million dollars.[12]  Arion stood to benefit from

the Bridge Offering in three ways:  ISR would pay him $2,661,889.00 out of the

funds it raised in the Bridge Offering for EMX Inc., which he owned in full; he had

an agreement to earn an annual salary of $100,000 with ISR that would only be

paid upon the success of their financing efforts; and his interest in ISR would

substantially increase in value if the company could raise the necessary capital and

---

[9]     *See id.* ¶ 24.

[10]    *See id.* ¶ 25.

[11]    *See id.*  ISR never actually signed the Subscription Agreement, but the
contract did not require ISR to sign it in order to accept its terms.  The Agreement
defined acceptance as ISR receiving the Subscription Amount and not returning
any of the payment within five days.  *See* Subscription Agreement, Ex. 3 to Am.
Compl. at 3.  Because ISR did not return any such payment, the Subscription
Agreement was a legally effective contract between Recurrent and ISR.

[12]    *See* PPM at 20.

4

complete the proposed transactions.[13]  Arion owned 7.5% of ISR's common stock prior to obtaining the bridge financing and planned to retain 4.13% after dilution from the Bridge Offering.[14]

The Subscription Agreement included a forum selection clause providing that it "shall be governed by and construed under the laws of the State of New York," which extended to "[a]ny legal suit, action or proceeding arising out of or relating to this Subscription Agreement."[15]  The clause further mandated that parties to the contract "waive any objection . . . to the venue" of the Southern District of New York, and "irrevocably consent to jurisdiction" in the Southern District.[16]

ISR represented to Einwohner and Recurrent that it had entered into binding agreements with EMX Inc., Wave, and SensArray to acquire one hundred percent of their outstanding capital stock.[17]  However, at the time the Chief Executive Officer of SensArray died in November 2008, ISR encountered a serious

---

[13]     *See* Am. Compl. ¶  23.

[14]     *See* PPM at 20.

[15]     Am. Compl. ¶ 28; Subscription Agreement at 10.

[16]     Am. Compl. ¶ 28; Subscription Agreement at 10.

[17]     *See* Am. Compl. ¶ 19.

cashflow problem.[18]  ISR subsequently defaulted on the Bridge Loan the following

month.[19]

        After the default, Herrmann and Highland reassured Recurrent and

Einwohner that they were working to salvage the deal to acquire the two remaining

companies, EMX Inc. and Wave.[20]  But instead, in May 2010, Hermann and Arion

formed a new entity, EMX Group, Inc. ("EMX Group"), a Florida corporation with

its principal place of business in Florida, located in the same office as ISR.[21]

Herrmann also brought in Robert Gibbs as his new partner in EMX Group.[22]

Shortley thereafter, EMX Group acquired ISR's corporate opportunities for no

consideration, including the opportunity to purchase EMX Inc.[23]  Herrmann

subsequently obtained a written commitment from Arion[24] to sell one hundred

---

[18]     *See id.* ¶ 30.  The Amended Complaint is unclear as to the causal
relationship between the death and the cashflow problem, but implies that ISR had
acquired SensArray by that point in time.

[19]     *See id.* ¶ 31.

[20]     *See id.* ¶¶ 34-36.

[21]     *See id.* ¶¶ 8, 9, 38.

[22]     *See id.* ¶ 40.

[23]     *See id.* ¶ 38.

[24]     Arion was the Chief Executive Officer and sole shareholder of EMX
Inc.  *See id.* ¶¶ 23, 39.

percent of EMX Inc. to EMX Group.[25]

Gibbs told Recurrent and Einwohner that they could still salvage their original investment in ISR by helping EMX Group acquire EMX Inc.[26]  In return for their help, Gibbs and Herrmann promised a five and ten percent equity interest in the resultant company to Recurrent and Einwohner, respectively.[27]  In reliance on those representations, between May and December 2010, Einwohner invested substantial time and effort into supporting EMX Group's attempts to acquire EMX Inc.[28]  He received no compensation for his efforts except the promised equity interest.[29]  Those efforts included meeting with EMX Group's new underwriter, Anderson & Strudwick, Inc., a Virginia-based investment bank.[30]  Einwohner also met with EMX Group's new counsel, Stephen Hazard of McElroy, Deutsch, Mulvaney & Carpenter LLP ("McElroy Deutsch"), a New Jersey-based law firm.[31]  Throughout this period, Gibbs and Herrmann repeatedly reiterated their promise to

---

[25]     *See id.* ¶ 39.

[26]     *See id.* ¶ 41.

[27]     *See id.* ¶ 42.

[28]     *See id.* ¶¶ 43-46.

[29]     *See id.* ¶¶ 43-48.

[30]     *See id.*. ¶ 44.

[31]     *See id.*

Recurrent and Einwohner of future equity interests in EMX Group or its successor.[32]

EMX Group had no officers, directors, or shareholders, and was wholly uncapitalized.[33]  Einwohner, through his personal investment company Cragmont, a Delaware limited liability company with its principal place of business in New York, extended a small loan to EMX Group.  In exchange, EMX Group promised Cragmont thirty thousand shares of its common stock and the possibility of additional shares as payment for interest on the loan.[34]  As of December 2011, the Cragmont loan remained unpaid and Cragmont had received none of the promised shares.[35]

In October of 2010, Herrmann, Gibbs, and Arion created EMX-I, a Delaware corporation with its principal place of business in Florida, through which they hoped to finally complete the acquisition of EMX Inc.[36]  EMX-I was located at the same address as EMX Group and ISR.[37]  Though EMX-I had no tangible

---

[32]     *See id.* ¶¶ 46-47.

[33]     *See id.* ¶ 49.

[34]     *See id.* ¶¶ 6, 49-52.

[35]     *See id.* ¶ 52.

[36]     *See id.* ¶¶ 10, 53-54.

[37]     *See id.* ¶¶ 8-10.

assets, it acquired the rights, resources, and corporate opportunities of EMX Group for no consideration, including the opportunity to purchase EMX Inc.[38] Subsequently, Gibbs proposed a draft term sheet for the acquisition of EMX Inc.[39] The term sheet provided for Einwohner to receive his promised ten percent interest and Recurrent its five percent interest in the new company.[40]  Shortly thereafter, Herrmann, Gibbs, and Arion ceased all contact with Recurrent and Einwohner.[41]

In January of 2011, Herrmann, Gibbs, and Arion formed yet another company, EMX-II, a Delaware corporation with its principal place of business in Florida.[42]  EMX-II shares an address with Herrmann.[43]  EMX-II acquired the rights and resources of EMX-I, including the opportunity to purchase EMX Inc., for no consideration.[44]  The following July, using Anderson & Strudwick as its underwriters and McElroy Deutsch as its counsel, EMX-II actually acquired EMX Inc., relying at least in part on the analysis and efforts made by Einwohner on

---

[38]     *See id.* ¶ 53.

[39]     *See id.* ¶ 54.

[40]     *See id.*

[41]     *See id.* ¶ 55.

[42]     *See id.* ¶¶ 11, 57.

[43]     *See id.* ¶¶ 11, 12.

[44]     *See id.* ¶ 57.

behalf of EMX Group.[45]

On January 31, 2012, plaintiffs brought the instant action seeking to: enforce the terms of the Subscription Agreement; enforce the terms of the Cragmont Note; recover damages arising out of defendants' alleged breaches of fiduciary duties, misappropriation of corporate opportunity, and fraudulent conveyance; and recover restitution for defendants' unjust enrichment.

## III.   LEGAL STANDARDS

### A.    Rule 12(b)(2) Motion to Dismiss

When a federal district court sits in diversity, "personal jurisdiction is determined by the law of the state in which the district court sits."[46]  A court may rely solely on pleadings and affidavits to determine jurisdiction, in which case the plaintiff "need only make a prima facie showing that the court possesses personal jurisdiction over the defendant."[47]  The court must credit plaintiffs' factual averments as true.[48]  "[A]ll allegations are construed in the light most favorable to

---

[45]    *See id.. ¶ 58.*

[46]    *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

[47]    *Id.* (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).  *Accord Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984).

[48]    *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."[49]   However, if a defendant "rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction—and plaintiffs do not counter that evidence—the allegation may be deemed refuted."[50]   If the court finds personal jurisdiction proper under state law – here, New York Civil Practice Law and Rules ("CPLR") sections 301 and 302 – it must then determine if exercising jurisdiction would exceed the bounds of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[51]

## B.    Motion to Transfer Venue Under Section 1404(a)

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."   The moving party bears the burden of satisfying two requirements in order to successfully transfer an action under section 1404(a).[52]   "*First*, the transferee court must be able to exercise

---

[49]    *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

[50]    *Schenker v. Assicurazioni Genereali S.p.A., Consol.*, No. 98 Civ. 9186, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002).

[51]    *See id*. at *1.

[52]    *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).

11

jurisdiction over the parties and must be an appropriate venue for the action; *second*, the balance of convenience and justice must favor transfer."[53]  The district court has broad discretion to decide motions to transfer and should do so upon determinations of "convenience and fairness on a case-by-case basis."[54]

The court should consider the following factors in deciding a section 1404(a) transfer motion: (1) plaintiff's choice of forum, (2) the convenience to witnesses, (3) the location of relevant documents and ease of access to sources of proof, (4) the convenience of parties to the suit, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, (7) the relative means of the parties, (8) the forum's familiarity with the governing law, (9) trial efficiency, and (10) the interest of justice, based on the totality of circumstances.[55]

### C.   Motion to Dismiss for Forum Non Conveniens

The common law doctrine of forum non conveniens invests courts with the discretion to "dismiss a claim even if the court is a permissible venue with

---

[53]   *Fellus v. Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 617 (S.D.N.Y. 2011) (citing *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988)).

[54]   *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992) (citing *Stewart*, 487 U.S. at 29).

[55]   *See Fellus*, 783 F. Supp. 2d at 617-18; *see also D.H. Blair,* 462 F.3d at 106-07 (listing factors 1-7 as "some" of the factors to consider).

proper jurisdiction over the claim."[56]  Dismissal is appropriate to avoid

"oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's

convenience."[57]  But district courts have "more discretion to transfer under

[section] 1404(a) than they [do] to dismiss on grounds of forum non conveniens."[58]

As a result, forum non conveniens "'has continuing application only in cases where

the alternative forum is abroad,' and perhaps in rare instances where a state or

territorial court serves litigational convenience best."[59]  When the alternative fora

are sister federal courts, "Congress has codified the doctrine and has provided for

transfer, rather than dismissal" pursuant to section 1404(a).[60]  The defendant bears

the burden of showing the existence of an alternative forum.[61]

### D.    The Enforceability of Forum Selection Clauses

Forum selection clauses are entitled to a "presumption of

---

[56]     *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir.1998).

[57]     *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518 (1947) (quotation marks omitted)).

[58]     *Id*. at 253.

[59]     *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 449, n. 2 (1994) (internal citation omitted)).

[60]     *Id.*

[61]     *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000).

enforceability."[62]  A party can rebut that presumption with a showing that

"enforcement would be unreasonable and unjust, or . . . the clause was invalid for

such reasons as fraud or overreaching."[63]  The Supreme Court, in *M/S Bremen v.*

*Zapata*, held that when parties have "freely negotiated" a forum selection clause, a

contention by one party that the forum is so inconvenient as to be unjust should fail

unless the moving party shows that "trial in the contractual forum will be so

gravely difficult and inconvenient that he will for all practical purposes be

deprived of his day in court."[64]  The Second Circuit has recognized the *M/S*

*Bremen* holding as approving a "pre-existing favorable view" of forum selection

clauses that applies broadly to all such clauses.[65]  Courts should treat a forum

selection clause as "a significant factor that figures centrally in the district court's

[transfer] calculus."[66]  As the parties' "expressed preference," a forum selection

clause impacts both the convenience and fairness prongs of the transfer analysis.[67]

---

[62]  *Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009).

[63]  *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15 (1972).

[64]  407 U.S. at 18.

[65]  *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475-76 (2d Cir. 2011) (rejecting the notion that *M/S Bremen* only applies to admiralty law or international agreements).

[66]  *Stewart*, 487 U.S. at 29.

[67]  *Id.*

## IV.   APPLICABLE LAW

### A.   Jurisdiction by Contractual Consent

A party can consent to personal jurisdiction by contract prior to litigation.[68]  Contractual consent to jurisdiction, through forum selection clauses, "obviat[es] the need for a separate analysis of the [Constitutional] propriety of exercising personal jurisdiction."[69]  This Circuit agrees with a number of other Circuits that "the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause."[70]  The various doctrines under which non-signatories are bound by forum selection

---

[68]     *See National Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964) (" [I]t is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court.").

[69]     *Packer v. TDI Sys., Inc.*, 959 F. Supp. 192, 196 (S.D.N.Y. 1997) (citing *Jones v. Weibrecht*, 901 F.2d 17, 18 (2d Cir. 1990)).  *Accord D.H. Blair & Co.*, 462 F.3d at 103 (no due process analysis needed once court established personal jurisdiction through a forum selection clause).

[70]     *Aguas Lenders*, 585 F.3d at 701 (citing with approval *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450 (9th Cir. 2007); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983), *overruled on other grounds by Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495 (1989); *TAAG Linhas Aereas de Angola v. Transam. Airlines, Inc.*, 915 F.2d 1351 (9th Cir. 1990); *Marano Enters. of Kansas v. Z–Teca Rests., L.P.*, 254 F.3d 753 (8th Cir. 2001); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206 (7th Cir. 1993); *Bonny v. Society of Lloyd's*, 3 F.3d 156 (7th Cir. 1993)).

clauses include the successor-in-interest[71] and "closely related" doctrines.[72]

### 1.    Successor-in-Interest

The successorship doctrine "prevents parties to contracts from using evasive, formalistic means lacking economic substance to escape contractual obligations."[73]  Successor liability is appropriate under New York common law in four situations: (1) a buyer assumes the seller's liabilities; (2) the transaction was undertaken to defraud investors; (3) the buyer and seller engaged in a de facto merger; or (4) the buyer is a mere continuation of the seller.[74]

The de facto merger doctrine invests courts with discretion to consider multiple factors "in a flexible manner that disregards mere questions of form and asks whether, in substance, 'it was the intent of [the successor] to absorb and

---

[71]    *See id.* ("[A] forum selection clause is integral to the obligations of the overall contract, and a successor in interest should no more be able to evade it than any other obligation under the agreement.").

[72]    *See, e.g.*, *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22882137 at *5-6  (S.D.N.Y. Dec. 4, 2003) (non-party to contract bound by its forum selection clause by virtue of being closely related to signatory company in her capacity as its CFO).

[73]    *Aguas Lenders*, 585 F.3d at 701 (citing *United States v. Mexico Feed and Seed Co., Inc.,* 980 F.2d 478, 487 (8th Cir. 1992) and *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1246 (6th Cir. 1991)).

[74]    *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003).

continue the operation of [the predecessor].'"[75]   Appropriate factors for consideration include: continuity of ownership; whether the predecessor company ceased operations; whether the successor company assumed liabilities necessary to the predecessor's operations; and continuity of management, personnel, physical location, assets, and general business operation.[76]   While not all factors necessarily need be present, "'continuity of ownership is the essence of a merger' and is what helps [] distinguish a merger from an asset sale."[77]   "The continuity-of-ownership element 'is designed to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability.'"[78]

### 2.   The Closely Related Doctrine

A non-party to a contract may be subject to its forum selection clause

---

[75]   *Nettis v. Levitt*, 241 F.3d 186, 194 (2d Cir. 2001) (per curiam) (quoting *Woodrick v. Jack J. Burke Real Estate, Inc.*, 703 A.2d 306, 314 (N.J. Super. Ct. App. Div. 1997)), *rev'd on other grounds, Slayton v. American Exp. Co.*, 460 F.3d 215 (2d Cir. 2006).

[76]   *See id.*

[77]   *New York v. National Service Indus., Inc.*, 460 F.3d 201, 211 (2d Cir. 2006) (quoting *Cargo Partner*, 352 F.3d at 47).

[78]   *Id.* (quoting *United States v. General Battery Corp.*, 423 F.3d 294, 305 (3d Cir. 2005)).

17

if the non-party is so "closely related" to either the parties to the contract[79] or the

contract dispute itself[80] that enforcement of the clause against the non-party is

foreseeable.  However, "the phrase 'closely related' is not particularly

illuminating,"[81] and as such courts have varied in their application of the doctrine.[82]

Nonetheless, many courts have used the doctrine to bind non-party, non-signatory

---

[79]     *See In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 369 (S.D.N.Y. 2011) ("a forum selection clause may bind non-parties to a contract if 'the relationship between the non-party and the signatory [is] sufficiently close so that the non-party's enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound.'") (quoting *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 Civ. 10550, 2000 WL 1277597, at *3 (S.D.N.Y. Sept. 7, 2000)).

[80]     *See, e.g.*, *Cuno, Inc. v. Hayward Indust. Prods., Inc.*, No. 03 Civ. 3076, 2005 WL 1123877 (S.D.N.Y. May 10, 2005) (non-party is closely related to dispute when its interests are derivative of and predicated upon the interests of the signatory).

[81]     *In re Lloyd's Am. Trust Fund Litig.*, 954 F. Supp. 656, 669 (S.D.N.Y. 1997).

[82]     *See, e.g.*, *Thibodeau v. Pinnacle FX Invs.*, No. 08 Civ. 1662, 2008 WL 4849957, at *5 n. 4 (E.D.N.Y. Nov. 6, 2008) (principals of signatory corporation bound because they were closely related to the signatory and being sued in connection with their activity at signatory corporation); *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 329 (S.D.N.Y. 2008) (successor to signatory was closely related); *Burrows Paper Corp. v. Moore & Assocs.*, No. 07 Civ. 62, 2007 WL 2089682, at *3 (N.D.N.Y. July 20, 2007) (third-party beneficiary is closely related as it would "defy logic" to allow non-signatory to seek enforcement of the agreement but avoid its obligations); *Weingrad v. Telepathy, Inc.*, No. 05 Civ. 2024, 2005 WL 2990645, at *5–6 (S.D.N.Y. Nov. 7, 2005) (finding non-signatories closely related where they allegedly acted in concert); *Nanopierce*, 2003 WL 22882137, at *5–6 (enforcing forum selection clause against CFO of signatory company).

corporate officers to contracts entered into by their corporate employer.[83]

Regardless of the specific application, the enforcement of the forum selection

clause against the non-party must have been foreseeable prior to suit, which

implies that the non-signatory must have been otherwise involved in the

transaction in some manner.[84]

### B.   Breach of Fiduciary Duty

Although a precise definition of a fiduciary relationship is

"'impossible of statement,' a fiduciary relationship may be found in any case 'in

which . . . confidence has been reposed and betrayed.'"[85]  Under New York law,

establishing a fiduciary duty is necessarily "fact-specific," and the duty

characteristically evinces "a higher level of trust than normally present in the

---

[83]     *See, e.g.*, *Nanopierce*, 2003 WL 22882137, at *5-6; *Thibodeau*, 2008 WL 4849957, at *5 n. 4; *Firefly Equities, LLC v. Ultimate Combustion Co., Inc.*, 736 F. Supp. 2d 797, 799 (S.D.N.Y. 2010) (binding corporate officer to contract signed in his capacity as corporate officer).  *See also Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n. 5 (9th Cir. 1988) (enforcing forum selection clause against non-signatory directors of a corporation).

[84]     *See Hugel*, 999 F.2d at 210 ("In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound.").

[85]     *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (quoting *Penato v. George*, 383 N.Y.S.2d 900, 904 (2d Dep't 1976)).

19

marketplace between those involved in arm's length business transactions."[86]

Particularly relevant here is that "one who . . . is a shareholder, officer and director

of a closely held corporation, is under a duty 'to deal fairly, in good faith, and with

loyalty' to . . . other shareholders."[87] "[S]hareholders in a closely held corporation

share a fiduciary duty among themselves."[88]  Shareholders can breach that duty by

"utilizing information obtained in a fiduciary capacity to appropriate a business

opportunity belonging to the corporation."[89]

## V.    DISCUSSION

### A.    This Court Has Personal Jurisdiction Over EMX- II

#### 1.    EMX-II Is the Successor-in-Interest to ISR, EMX Group, and EMX-I

Plaintiffs argue that EMX-II is ISR's successor-in-interest and, as

such, is bound by the forum selection clause in the Subscription Agreement.[90]

Because EMX-II engaged in de facto mergers with ISR, EMX Group, and EMX-I,

---

[86]    *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) (citing *Northeast Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158 (1993)).

[87]    *American Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 905 (2d Cir. 1998) (quoting *Benson v. RMJ Sec. Corp.*, 683 F. Supp. 359, 375 (S.D.N.Y. 1988)).

[88]    *Benson*, 683 F. Supp. at 374.

[89]    *American Fed. Group*, 136 F.3d at 906.

[90]    *See* Opp. Mem. at 27-28.

it is indeed ISR's successor-in-interest.  Failure to find successorship would allow defendants to "us[e] evasive, formalistic means lacking economic substance to escape contractual obligations."[91]

### a.   EMX Group Was ISR's Successor-in-Interest

Taking plaintiffs' factual averments as true and drawing all inferences in their favor, the intent of EMX-II was "to absorb and continue the operation of" ISR and its subsequent iterations.[92]  ISR's animating purpose was to acquire EMX Inc. and two other defense contractors,[93] and its operations focused on preparation for those transactions.[94]  Those efforts continued through May 2010, when Herrmann, ISR's founder and CEO, helped found a new entity, EMX Group.[95] EMX Group had the same address as ISR.[96]  Upon the formation of EMX Group, ISR's operations in pursuit of EMX Inc. effectively ceased, as ISR's former executive instead entered into an agreement to purchase EMX Inc. on behalf of his

---

[91]   *Aguas Lenders*, 585 F.3d at 701.

[92]   *Nettis*, 241 F.3d at 194; Am. Compl. ¶¶ 38-39, 53-54, 57-58.

[93]   *See* PPM.

[94]   *See* Am. Compl. ¶¶ 18-23.

[95]   *See id.* ¶¶ 34-38.

[96]   *See id.* ¶¶ 8-9.

new company, EMX Group.[97]  EMX Group also picked up where ISR left off by seeking out new underwriters for the same acquisition ISR had pursued – that of EMX Inc.[98]  ISR's original opportunity to acquire EMX Inc. was a valuable asset, founded on "Agreements and Plans of Merger pursuant to which ISR [would] acquire 100% of the outstanding capital stock of . . . EMX."[99]

Because EMX Group had common owners, physical location, and operations with ISR, its acquisition of ISR's valuable business opportunities created a de facto merger of the two companies.[100]  This is precisely the type of situation where "the shareholders of a seller corporation [attempt to] retain some ownership interest in their assets after cleansing those assets of liability," here the liability owed to Einwohner and Recurrent under the Subscription Agreement.[101]

### b.    EMX-I Was EMX Group's Successor-in-Interest

History repeated itself in October of 2010, when Herrmann helped found a third company, EMX-I, at the same address as ISR and EMX Group.[102]

---

[97]    *See id.* ¶ 39.

[98]    *See id.* ¶ 44.

[99]    PPM at 5.

[100]    *See Nettis*, 241 F.3d at 194.

[101]    *National Service Indus.*, 460 F.3d at 211 (quoting *General Battery Corp.*, 423 F.3d at 306 (quotation marks omitted)).

[102]    *See* Am. Compl. ¶¶ 8-10, 53.

All three companies had substantial ownership in common, with Herrmann founding all of them.[103]  EMX-I acquired EMX Group's business opportunities for no consideration, and immediately began pursuing the acquisition of EMX Inc.[104]

EMX Group's opportunity to acquire EMX Inc. was a valuable asset, based on a written commitment from EMX Inc.'s founder and CEO to sell one hundred percent of his company to EMX Group.[105]  Without any officers, directors, shareholders, or capital,[106]  EMX Group would become defunct by transferring its major assets – its corporate opportunities – for no consideration.  Accordingly, when EMX-I acquired the corporate opportunities of EMX Group, the two engaged in a de facto merger.

### c.   EMX-II Was EMX-I's Successor-in-Interest

In January of 2011, the ownership and management of EMX-I formed yet another company, EMX-II.  EMX-II does not share a common address with ISR and its two predecessors.[107]  However, I am persuaded that it nonetheless evinces a continuity of physical location because EMX-II shares a common

---

103     *See id.* ¶¶ 18, 38, 53.

104     *See id.* ¶¶ 53-54.

105     *See id.* ¶  39.

106     *See id.* ¶ 49.

107     *See id.* ¶¶ 8-11.

address with Herrmann, the founder and CEO of ISR, EMX Group, and EMX-I.[108]

EMX-II engaged in fundamentally the same operations as its predecessors,

succeeding where the others failed by acquiring EMX Inc.[109]  It did so after

acquiring the opportunity from EMX-I for no consideration, and in part by using

contacts, analysis, and efforts made on behalf of EMX-II's predecessor

corporations.[110]  As such, EMX-II's acquisition of a corporate opportunity from

EMX-I represented a de facto merger of the two companies.

### 2.  The Forum Selection Clause Is Enforceable Against ISR and Its Successors

The series of de facto mergers imputes ISR's liabilities and

contractual obligations – including those under the 2008 Subscription Agreement –

to all of ISR's successors-in-interest.[111]  "If successorship is established, a

non-signatory is subject to the [] presumption of the enforceability of mandatory

forum selection clauses."[112]

Notably, neither Arion nor EMX-II disputes the enforceability of the

forum selection clause against ISR.  Instead, they argue that the clause grants the

---

[108]    *See id.* ¶¶ 11-12.

[109]    *See id.* ¶ 58.

[110]    *See id.*

[111]    *See Nettis*, 241 F.3d at 193; *Aguas Lenders*, 585 F.3d at 701.

[112]    *Aguas Lenders*, 585 F.3d at 701.

24

court personal jurisdiction if the plaintiffs "only want to pursue their breach of contract claims on the non-recourse speculative investment agreements."[113]  Arion and EMX-II contend that the gravamen of plaintiffs' complaint is their "claims to obtain an ownership interest, or the value thereof, in [EMX-II]."[114]  This argument is of no moment, however, as personal jurisdiction is not claim specific,[115] and defendants have not moved to dismiss the breach of contract claims.  In any event, a number of plaintiffs' other claims,  including and especially the claims for breach of fiduciary duty, "aris[e] out of or relat[e] to [the] Subscription Agreement" and as such are covered by it.[116]  The Subscription Agreement made Einwohner and Recurrent joint shareholders with Herrmann, creating a fiduciary relationship among them.[117]  Subsequently, Herrmann allegedly breached those duties in his repeated efforts to cleanse his corporate assets of their liability to Einwohner and Reccurent.  All of plaintiffs' breach of fiduciary duty claims, including the aiding and abetting claim against EMX-II, arise out of, and are therefore covered by, the

---

[113]     Reply Memorandum of Law in Further Support of Motion to Dismiss Plaintiffs' Complaint or Transfer this Matter to the District Court for the Middle District of Florida ("Reply Mem.") at 1.

[114]     *Id.*

[115]     *See, e.g.*, Fed. R. Civ. P. 18; CPLR § 601.

[116]     Subscription Agreement at 10.

[117]     *See Benson*, 683 F. Supp. at 374.

Subscription Agreement.

Because EMX-II has not argued that the forum selection clause is unjust or unfair, the clause is enforceable against ISR and its successors-in-interest, including EMX-II.  Pursuant to the clause, I find that EMX-II has consented to jurisdiction in New York for all claims arising out of the Subscription Agreement, including several of the claims brought in this action.  EMX-II's contractual consent to jurisdiction "obviat[es] the need for a separate analysis of the [Constitutional] propriety of exercising personal jurisdiction."[118]

### B.   This Court Has Personal Jurisdiction Over Arion

Arion contends that because he is not a signatory to the Subscription Agreement, he is not bound by its forum selection clause.[119]  Plaintiffs contend that Arion is derivatively bound by ISR's agreement to the forum selection clause in the Subscription Agreement, and cite to a number of cases in support.  One of those cases, *Nanopierce Technologies*,[120] is directly on point.  The *Nanopierce* court, invoking the "closely related" doctrine, found a non-party to a contract bound to its forum selection clause by virtue of her position as the signatory

---

[118]   *Packer*, 959 F. Supp. at 196.

[119]   *See* Reply Mem. at 6-7.  This argument is particularly weak given that the duly executed Subscription Agreement did not require a signature for acceptance.  *See* Subscription Agreement at 3; Am. Compl. ¶ 25.

[120]   2003 WL 22882137.

26

company's Chief Financial Officer.[121]  Here, Arion was one of only five officers at

ISR.[122]  He was also a shareholder in ISR, a closely held corporation.[123] Arion

worked with Highland, ISR's New York agent, on its efforts to effectuate the

purchase of his company EMX Inc.[124]  Whether he did so as EMX Inc.'s CEO or as

an executive officer at ISR is immaterial; the fact that he worked with Highland in

any capacity[125] establishes that he had extensive knowledge of ISR's efforts to

raise capital in New York.  Those efforts were not ancillary to his involvement in

ISR.  If the financing had been successful, Arion would have substantially

benefitted from it apart from his capacity as a shareholder in ISR.  The financing

would have enabled ISR to purchase Arion's shares in EMX Inc. for a significant

sum of money[126] and pay him a generous annual salary.[127]  Those are unique and

significant personal benefits particular to Arion.  Whether or not Arion ostensibly

worked with Highland as EMX Inc.'s CEO, he was still an executive officer at ISR

---

[121]    *See id.* at *6.

[122]    *See* PPM at 58-60.

[123]    *See id.* at 20.

[124]    *See* Am. Compl. ¶ 21

[125]    *See* 4/28 Email; 5/5 Email.

[126]    *See* Am. Compl. ¶ 23.

[127]    *See id.*; PPM at 59.

with knowledge of and substantial connection to ISR's New York financing efforts.  On these facts alone, I am persuaded that Arion was closely related to those efforts.

Because Arion was closely related to ISR's efforts to obtain financing in New York, and because the Subscription Agreement was a product of those efforts, Arion is bound by the Subscription Agreement's forum selection clause. Pursuant to the clause, I find that Arion has consented to jurisdiction in New York for all claims arising out of the Subscription Agreement, including several of the claims brought in this action.  Arion's contractual consent to jurisdiction "obviat[es] the need for a separate analysis of the [Constitutional] propriety of exercising personal jurisdiction."[128]

## C.    Transfer Under Section 1404(a)

While a forum selection clause will not necessarily dispose of a motion to transfer under section 1404(a), it should be "a significant factor that figures centrally in the district court's [transfer] calculus."[129]  The court must still consider all the other relevant factors, with the forum selection clause informing their resolution.

The totality of factors counsel in favor of keeping the case in New

---

[128]    *Packer*, 959 F. Supp. at 196.

[129]    *Stewart*, 487 U.S. at 29, 31.

York.  The fact that the forum selection clause was freely negotiated strongly

suggests that its enforcement would satisfy the fairness prong of section 1404(a).[130]

Because the clause also provides for New York law to govern most, if not all, of

the claims in this action, this forum's familiarity with the relevant law favors

keeping the case here.  New York is also plaintiffs' choice of forum and their home

forum.  While the situs of injury for the breach of fiduciary duty claims is in

Florida, the transactions giving rise to that duty occurred mainly in New York, so

the locus of operative facts do not favor one forum over the other for plaintiffs'

breach of fiduciary duty claims.  The relevant facts for the contract and equity

claims likewise do not favor one forum over the other, as plaintiffs dealt with

ISR's New York agents in forming their contract with a Florida corporation.  A

number of witnesses are located in or near New York, negating many of the

convenience and process concerns raised by defendants.[131]  Perhaps most

importantly, New York has a strong interest in ensuring that participants in its

capital market are protected from the evasive means allegedly employed here to

avoid liabilities incurred in New York.

        While the Middle District of Florida may be an acceptable alternative

_____

[130]    *See id.* at 29 ("[T]he District Court will be called on to address such
issues as . . . the fairness of transfer in light of the forum-selection clause and the
parties' relative bargaining power.").

[131]    *See* Opp. Mem. at 33.

forum, this Court provides an equally reasonable forum.  Given that this Court is also the forum all parties agreed to in the Subscription Agreement and is the plaintiffs' choice, transfer to Florida is inappropriate.

**D.    Forum Non Conveniens**

In moving to dismiss on the grounds of forum non conveniens, the movant bears the burden of showing the existence of an alternative forum.[132]  Here, defendants suggest that the Middle District of Florida provides the appropriate alternative forum.[133]  But when alternative fora are sister federal courts, "Congress has codified the doctrine and has provided for transfer, rather than dismissal."[134]  Defendants do not even suggest, let alone demonstrate, that this case is one of the "rare instances where a state or territorial court serves litigational convenience best."[135]  The motion is plainly without merit and is therefore denied.

---

[132]    *See Wiwa*, 226 F.3d at 100.

[133]    *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Lack of Jurisdiction and Forum Non Conveniens or, Alternatively, to Refer this Matter to the District Court for the Middle District of Florida at 15.

[134]    *Sinochem Int'l*, 549 U.S. at 430.

[135]    *Id.*

30

## V.   CONCLUSION

For the foregoing reasons, all of defendants' motions are denied.  The Clerk of the Court is directed to close these motions [Docket No. 6].  A conference is scheduled for July 2 at 4:30 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 26, 2012

31

**- Appearances -**

**For Plaintiffs:**

Matthew J. Press, Esq.
Law Office of Matthew J. Press
The Chrysler Building
405 Lexington Avenue, Seventh Floor
New York, New York 10174
(212) 922-1111

**For Defendants:**

Scott S. Flynn, Esq.
McElroy, Deutsch, Mulvaney & Carpenter LLP
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
(973) 993-8100